UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JEFFREY DUANE WHITE,

    Plaintiff,

  v.                                            Case No. 20-CV-212

ANDREW M. SAUL,
**Commissioner of Social Security,**

    Defendant.

## DECISION AND ORDER

Jeffrey Duane White seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying his claim for a period of disability and disability insurance benefits and for supplemental security income under the Social Security Act, 42 U.S.C. § 405(g). For the reasons below, the Commissioner's decision is affirmed.

## BACKGROUND

White filed a Title II application for disability insurance benefits ("DIB") and a Title XVI application for supplemental security income ("SSI") in June 2017, alleging a disability onset date of June 27, 2017.[1] (Tr. 13.) These claims were denied initially on September 18, 2017, and upon reconsideration on December 12, 2017. (*Id.*) White alleges disability beginning on June 27, 2017 due to back, shoulder, and leg problems. White filed a request for a hearing on January 19, 2018. (*Id.*) A hearing was held before Administrative Law Judge ("ALJ") William Spalo on March 18, 2019. (Tr. 27.) Thomas A. Gusloff, an impartial

---

[1] White originally alleged a disability onset date of October 1, 2006 but amended to June 27, 2017. This amendment resulted in the dismissal of his claim for DIB.

vocational expert, was present at the hearing, and White was represented by attorney Hannah Pierce. (*Id.*) White testified at the hearing, as did Gusloff. (*Id.*)

In a written decision issued April 12, 2019, the ALJ found that White had the severe impairment of degenerative disc disease of the lumbar spine, status post-surgery with a history of lumbar radiculopathy. (Tr. 15.) The ALJ further found that White did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app.1 (the "listings"). (*Id.*) The ALJ found White had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 416.967(b), except he was limited to frequent stooping. (Tr. 16.)

While the ALJ found that White was unable to perform any past relevant work, he also found that given White's age, education, work experience, and RFC, other jobs that he could perform existed in significant numbers in the national economy. (Tr. 19.) As such, the ALJ found that White was not disabled from his alleged onset date until the date of the decision. (Tr. 20.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied White's request for review. (Tr. 1–6.)

## DISCUSSION

### 1. *Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every

piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

### 2. Application to this Case

White argues that the ALJ failed to: (1) sufficiently develop the record; (2) consider his shoulder impairment in evaluating his RFC; and (3) properly evaluate the opinion of consultative examiner, Dr. Nicholas Glass.

#### 2.1 Development of the Record

The sum total of White's medical records in this case is 27 pages, with only one exhibit from the relevant time period. (Pl.'s Br. at 5 (citing Tr. 285–312), Docket # 11.) White argues that the ALJ failed to sufficiently develop the record.

"While a claimant bears the burden of proving disability, the ALJ in a Social Security hearing has a duty to develop a full and fair record." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). The duty is "enhanced" when a claimant is unrepresented, *id.*, however, it does not go away when the claimant is represented, *Gray v. Astrue*, No. 10 C 1670, 2011 WL

3

332540, at *5 (N.D. Ill. Jan. 28, 2011) ("This presumption does not, however, eliminate an ALJ's independent duty to reasonably develop the record."). White was represented by counsel during the administrative proceedings (Tr. 25), including before the Appeals Council (Tr. 7, 56). Again, although having counsel does not absolve the ALJ's duty to develop the record, "a claimant represented by counsel is presumed to have made his best case before the ALJ." *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007); *see also Nicholson v. Astrue*, 341 F. App'x 248, 253 (7th Cir. 2009) ("Although we acknowledge that the ALJ bears some responsibility for the development of the record, at the same time the ALJ is entitled to assume that a claimant represented by counsel 'is making his strongest case for benefits.' An omission from the record is significant only if it is prejudicial to the claimant.") (internal citations omitted).

White argues that in the only record from the relevant time period, the August 17, 2017 consultative examination by Dr. Glass, White reported his previous back surgery, as well as an emergency room visit for ulcer-related complications. (Pl.'s Br. at 5.) White also specifically mentioned a treating provider to Dr. Glass—Dr. Stoll. (*Id.* at 5–6.) White argues that despite having this information, the ALJ failed to obtain any of White's treatment notes. (*Id.* at 6.) White further argues that the State Agency physicians considered evidence not contained in the record before the ALJ. (*Id.* at 5 (citing Tr. 82–83).) As such, White argues that because there "is clearly evidence regarding [White's] impairments not contained in the record," White was prejudiced by the ALJ's failure to develop the record. (*Id.*)

First, as to White's alleged ulcer-related complications, the only information regarding this condition is a single notation in Dr. Glass' report that White went to the ER for ulcer-related blood in his stool sometime in 2016. (Tr. 307.) This single ER visit occurred prior to

4

White's alleged onset date and he has not alleged that the ulcer impedes his ability to work. Furthermore, White did not list his ulcer as a disabling condition in his Field Office Report to the SSA (Tr. 239), nor did he testify that his ulcer limited his ability to work (Tr. 34). Thus, it is unclear how the ALJ erred in failing to obtain this ER record from 2016 regarding his ulcer.

White also contends that the ALJ had notice that White had a treating physician, Dr. James Stoll, but failed to obtain any of Dr. Stoll's records. (Pl.'s Br. at 6.) But the record evidence seems to indicate that White was not treating *at all*, much less with Dr. Stoll. White was asked at the administrative hearing whether anybody had done anything for his back since his 2006 surgery. (Tr. 35.) White testified that he had not had any injections or physical therapy, and only took over-the-counter medication. (Tr. 35.) In his June 28, 2017 Disability Report, he indicated that he last treated with Dr. Stoll in December 2006 and had no further appointments scheduled. (Tr. 242.) White replied "No" to the query of whether "anyone else" had "medical information about any of your physical and/or mental conditions." (Tr. 243.) In his October 18, 2017 Disability Report, when asked whether he had seen a doctor or other health care provider, had received treatment at a hospital or clinic, or had a future appointment scheduled since he was last asked, White replied, "No." (Tr. 259.) Finally, in his Field Office Disability Report dated January 22, 2018, White again replied "No" to the question of whether he had any treatment since he was last asked, or whether he had any future treatment scheduled. (Tr. 266–67.) During his March 18, 2019 hearing, White's counsel was asked whether she had any objection to the exhibits as entered, and she replied that she did not. (Tr. 28.) Nor did White's counsel provide additional records to the Appeals Council. (Tr. 4, 193–98.) Thus, if White had missing treatment records, he had ample time to

5

provide them. There is absolutely nothing in this record to alert the ALJ that treatment records from the relevant time period existed that had not been provided.

Finally, White argues that the State Agency physicians considered evidence not contained in the record before the ALJ. (Pl.'s Br. at 5.) Although White does not develop this argument, he cites to pages 82–83 of the administrative transcript, where State Agency physician Yacob Gawo noted that "one source, below, has been previously considered but was not in the initial file folder." (Tr. 82.) Dr. Gawo reports that this source was two records from the Midwest Spinal Center. (Tr. 83.) The first record, from June 2006, states that White was seen on follow-up for back pain. (Tr. 83.) Dr. Gawo noted that the record showed White was "doing reasonably well," was "75 to 80% better," but had some lower extremity weakness. (*Id.*) The diagnosis was herniated lumbar disk with radiculopathy. (*Id.*) The second record, from April 2006, indicated that White was "doing well, some continued mild weakness," and the assessment was "L4 radiculop." (*Id.*) Again, it is entirely unclear how the ALJ erred in not obtaining these two records. Beyond these records predating White's alleged onset date, White does not argue how they would have changed the outcome of his case. As such, the ALJ did not err in his development of the record.

### 2.2 Evaluation of Shoulder Impairment

White argues that the ALJ erred at both steps two and four in failing to consider and assess his shoulder impairment. In step two of the five-step analysis, an ALJ determines whether an alleged impairment is severe or non-severe. At step four, an ALJ determines whether a claimant retains the RFC to perform his past relevant work. Because an ALJ must assess all mental and physical impairments, whether severe or not, in determining one's RFC, any error at step two is likely harmless if the ALJ fulfills his obligation at step four. *Masch v.*

6

*Barnhart*, 406 F. Supp. 2d 1038, 1054 (E.D. Wis. 2005). It is undisputed that the ALJ did not consider whether White's shoulder impairment was severe at step two (Tr. 15); however, the ALJ clearly addressed White's allegations of disabling shoulder pain in addressing his RFC (Tr. 16–17). Thus, I will focus my analysis on whether the ALJ erred in failing to include limitations in White's RFC due to shoulder pain.

White testified that he has a deteriorated muscle that causes pain in his right shoulder. (Tr. 43.) He testified that his right shoulder pain began three or four years before the March 2019 hearing, but he could not remember whether he sustained an injury that caused the pain. (Tr. 44.) He stated that his right shoulder pain occurs "quite often," that he sometimes feels numbness and tingling, and that the pain prevents him from using his right arm at times. (Tr. 44–45.) White testified that he could reach down and in front of himself; however, he struggles to reach above his head and will only reach up to get something from the cabinet, for example, if he forces himself to when no one else is home. (Tr. 46–47.)

Because the record evidence is generally sparse during the relevant time period, the evidence is also sparse regarding White's alleged shoulder impairment. What the evidence does show is that White underwent an orthopedic disability evaluation in January 2015, in which he stated that he experienced right arm and shoulder pain and had "persistent limitation of right shoulder motion and decreased right hand strength," for several years. (Tr. 302.) Physical examination at that time indicated limitations with right shoulder abduction and forward flexion and decreased grip strength. (*Id.*) White had palpatory pain of the right anterior shoulder, but no signs of atrophy. (*Id.*) Right shoulder imaging showed some degenerative changes in the right acromioclavicular junction, but the femur and ball of the socket were well positioned with no significant degenerative change. (Tr. 303.)

7

In August 2017, White told Dr. Glass that he had an x-ray of his shoulder the previous year, but could not recall where and Dr. Glass noted that there was no shoulder imaging available to him. (Tr. 306.) During this examination, White stated that he had right shoulder pain since about 2009 and had a right bicep muscle rupture two years ago after falling from a steel railing. (*Id.*) Dr. Glass found upon physical examination that White's right bicep had the "classic appearance of distal muscle/tendon rupture/avulsion, and breakaway weakness (4/5) of the right elbow supination and flexion" and White had reduced abduction and forward elevation of the right shoulder. (Tr. 309.) His grip strength, however, was normal. (*Id.*)

White argues that the ALJ "mischaracterized the already barren record" regarding his shoulder impairment and found it noteworthy that the State Agency physicians found White's shoulder impairment severe. (Pl.'s Br. at 9.) White's contention that the ALJ mischaracterized the record evidence is simply inaccurate. The ALJ specifically considered Dr. Glass' finding that White had minimal decrease in abduction and forward flexion, with otherwise normal findings. (Tr. 17.) The ALJ also considered that despite White's allegations of disabling shoulder pain, his strength testing was normal in all extremities and the record was devoid of treatment or diagnostic tests for right shoulder pain to support any limitations in the right arm. (*Id.*) This is an accurate recitation of the record. And while White finds it noteworthy that the State Agency physicians, unlike the ALJ, found White's shoulder impairment severe, they also found him capable of light work without further shoulder-related limitations. (Tr. 64, 83.) For these reasons, White has not shown the ALJ erred in his assessment of his shoulder impairment.

8

Case 2:20-cv-00212-NJ   Filed 03/12/21   Page 8 of 11   Document 17

### 2.3 Evaluation of Dr. Glass' Opinion

Finally, White argues that the ALJ erred in finding the opinions of the State Agency physicians more persuasive than the opinion of Dr. Glass. The ALJ must evaluate the persuasiveness of all medical opinions in the record. 20 C.F.R. § 404.1520c(a). In so doing, the ALJ looks at multiple factors; however, the most important factors the ALJ considers are the opinions' supportability and consistency with the other evidence of record. §§ 404.1520c(a), (c).

Dr. Glass, a consultative examiner, opined that White had the following "suspected limitations": (1) tolerate standing only occasionally in an eight-hour workday; (2) "most likely" able to sit frequently in an eight-hour workday, but may need relatively frequent opportunities to stand/move around; (3) able to walk only occasionally in an eight-hour workday; (4) has a limited ability to squat, bend, or stoop; and (5) can lift and carry twenty pounds occasionally on the left side and five to ten pounds occasionally on the right side. (Tr. 310.) The ALJ did not find Dr. Glass' opinion persuasive, stating that it was largely based on White's subjective allegations and was not supported by his objective examination findings. (Tr. 18.) For example, the ALJ found that White was able to sit and stand without difficulty, was able to reach for his feet, and had full strength and intact sensation in all extremities. (*Id.*) The ALJ found the opinions of the State Agency physicians, on the other hand, persuasive because they were supported by Dr. Glass' objective findings and the other record evidence. (*Id.*)

White argues that the ALJ's finding is based upon a faulty understanding of the record. (Pl.'s Br. at 12.) Specifically, White faults the ALJ for stating that Dr. Glass' physical examination showed that the range of motion testing of the lumbar spine was within normal

9

limits (*id.* (citing Tr. 17)), when the records showed that White had decreased range of motion of his lumbar spine in both forward flexion and extension (*id.* (citing Tr. 309).) Further, White argues that the ALJ erred in stating that White's range of motion testing was "generally normal," when Dr. Glass' examination showed decreased range of motion of the right shoulder. (*Id.*)

The ALJ did not misstate the record in considering Dr. Glass' opinion. Rather, White does not include the entirety of the ALJ's quote in his brief. The ALJ did not merely state "[r]ange of motion testing of the lumbar spine were [sic] within normal limits" as White contends (*id.* at 12 (citing Tr. 17)); rather, the full quote of the ALJ reads: "Range of motion testing of the lumbar spine [was] within normal limits and showed generally normal findings, with normal rotation and lateral flexion and approximately 80% of normal extension" (Tr. 17). This is consistent with Dr. Glass' objective findings, which showed: "Lumbar spine – normal rotation and lateral flexion, 85-90% of normal forward flexion, ~80% of normal in extension." (Tr. 309.) Furthermore, the ALJ specifically noted that Dr. Glass' examination showed decreases in abduction and forward elevation of the shoulder. (Tr. 17.) And again, as stated above, the State Agency physicians considered Dr. Glass' examination in determining White capable of light work. (Tr. 61–62, 81, 83.) For these reasons, White has not shown the ALJ erred in his consideration of Dr. Glass' opinion.

## CONCLUSION

White argues the ALJ made several errors in determining he was not disabled. I find the decision is supported by substantial evidence. The Commissioner's decision is affirmed.

**ORDER**

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **AFFIRMED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 12th day of March, 2021.

BY THE COURT

_____
NANCY JOSEPH
United States Magistrate Judge